In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3596

HK SYSTEMS, INC.,

*Plaintiff-Appellant*,

*v.*

EATON CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-1103—**Lynn Adelman**, *Judge*.

ARGUED SEPTEMBER 3, 2008—DECIDED JANUARY 28, 2009

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.    This is a diversity suit for breach of contract. The substantive issue, one of Wisconsin law, is the scope of an indemnification clause in a contract for the sale of a business. The clause required the seller, defendant Eaton, to indemnify the buyer, plaintiff HK, for all losses resulting from any "misrepresentation," "act or omission," or "occurrence of a matter . . . relating to or arising out of the period on or before the Closing Date."

IBP, a large beef processor, wanted to replace the automated material-handling system in its beef-processing plant in Nebraska. Eaton-Kenway, a subsidiary of Eaton, and another company, Alvey, submitted a joint bid in response to IBP's request for proposals. IBP liked the bid and in December 1994 issued a two-sentence letter of intent to purchase the new system from the joint bidders.

Two months later, while IBP and the joint bidders were in the midst of negotiations aimed at transforming the bid into a contract, Eaton sold Eaton-Kenway to HK. The following month IBP signed a contract with HK for the material-handling system, with Alvey a subcontractor of HK. That is the contract that contains the indemnification clause. Eaton had nothing to do with the contract negotiations after it sold Eaton-Kenway to HK.

Three years later, IBP sued HK in Nebraska for fraud and breach of contract. The fraud claim was that before the sale of Eaton-Kenway to HK Eaton had misrepresented to IBP the speed at which the material-handling system would operate. The breach of contract claim was that the system did not operate at the speed promised in the contract. The suit was settled, HK agreeing to pay IBP $8 million, though Alvey contributed $5 million of that amount. HK then brought this suit against Eaton for indemnification.

Eaton moved for summary judgment on the ground that the loss HK had incurred in settling IBP's suit had been caused not by Eaton but by HK's own actions. The district judge denied the motion and the case proceeded to trial. Eaton moved for judgment as a matter of law,

which the judge denied, and the jury awarded a little more than $3 million to HK. But Eaton then moved the judge to reconsider his earlier denial of its motion for summary judgment, and the judge granted the motion and dismissed the suit, precipitating this appeal by HK.

The judge's action in reconsidering his denial of summary judgment after the jury's verdict may seem odd; HK argues that it was improper. Although the standard for granting summary judgment is the same as the standard for granting judgment as a matter of law, *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999), the record compiled in a trial is bound to differ from the record on which a motion for summary judgment is based. Even if the motion should have been granted when made, any evidence properly admitted at trial is available for consideration if the judge is asked after the trial to reconsider his earlier denial of the motion—and if the opposing party has presented a convincing case at trial the inference is that the judge was right to deny the motion. So an appellate court will generally refuse to review the denial of a motion for summary judgment after the case has been tried. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718-19 (7th Cir. 2003). But the justification for refusing fails when the motion is denied because of a ruling on a pure question of law rather than on the adequacy of the evidence presented in opposition to the motion. *Id*. at 719-20, and cases cited there. For then if the ruling was erroneous and the motion should have been granted regardless of the evidence, the trial is an irrelevance. And that is this case.

But by not preserving, in its motion for judgment as a matter of law, its argument that HK was the author of its loss in the suit by IBP—which would have preserved the argument for appeal—Eaton took a big risk. The doctrine of law of the case counsels against a judge's changing an earlier ruling that he made in the same case, *Agostini v. Felton*, 521 U.S. 203, 236 (1997); *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816-17 (1988); *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006), or that his predecessor as presiding judge had made. *Fujisawa Pharmaceutical Co. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997); *In re Engel*, 124 F.3d 567, 583-85 (3d Cir. 1997). The doctrine has greater force in the second type of case—when there is a change of judges during the litigation and the new judge is asked to revisit the rulings of his predecessor. Reluctance to admit one's own errors discourages casual reconsideration of one's own rulings—but not of another judge's rulings. There was no change of judges here.

The doctrine of law of the case was applied to a motion to reconsider a summary judgment ruling in *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1223-24 (10th Cir. 2008), and doubtless in other cases as well. And while the doctrine obviously does not prevent an appellate court from correcting a trial judge's error, e.g., *United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1101-02 (9th Cir. 2008), Eaton failed as we said to preserve its challenge to the alleged error (in denying its motion for summary judgment) in its motion for judgment as a matter of law. So it had to throw itself on the judge's mercy. But the exercise of mercy was within his discre-

tion. "A judge may reexamine his earlier ruling (or the ruling of a judge previously assigned to the case, or of a previous panel if the doctrine is invoked at the appellate level) if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that had benefited from it," *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). These conditions are satisfied; we'll see that the judge had a solid basis for thinking he had erred. And in revisiting the issue of causation after the trial he was not depriving HK of the benefit of any of the evidence presented at the trial, because that evidence did not bear on the judge's decision. He had denied summary judgment on the basis of his reading of the indemnification clause, and in reconsidering the denial after the trial he continued to treat the meaning of the clause as a pure issue of law, unrelated to anything that had gone on at the trial. He ruled that the indemnification clause did not make Eaton liable for any part of the loss that HK had sustained in settling IBP's suit, because the contract between HK and IBP was an "intervening and superseding cause" of the loss that HK had suffered as a result of being sued by IBP.

This was not the most perspicuous articulation that the judge could have given of the ground of his decision, though it is a common formula in Wisconsin cases, see, e.g., *Smith v. Katz*, 595 N.W.2d 345, 357 (Wis. 1999), as in cases in other states. The term "intervening [or superseding] cause," like "proximate cause," "legal cause," "chain of causation" (the "chain" that the "intervening cause" "breaks"), and "but for" cause belongs to an old-fashioned

tort vocabulary. It would be clearer to speak in terms of responsibility, because the object of "causal" analysis in law is merely to determine who shall be responsible for some untoward event; in this case it is the loss that HK incurred as a result of the failure of the material-handling system to perform up to IBP's expectations—the failure that gave rise to IBP's suit against HK.

If a tanker truck spills oil, and a malicious passerby deliberately drops a lighted match into the resulting pool, starting a fire that inflicts a loss on a third party, the victim cannot recover damages from the truck company even if the spill was caused by the company's negligence. The "reason" is said to be that the arson was an "intervening cause" of the loss. *Leposki v. Railway Express Agency, Inc.*, 297 F.2d 849 (3d Cir. 1962); *Giebel v. Richards*, 591 N.W.2d 901, 904 (Wis. App. 1999); *Stone v. Boston & Albany R.R.*, 171 Mass. 536, 536-43 (Mass. 1898); cf. *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 620-21 (7th Cir. 2002) (Wisconsin law). Yet an "intervening" criminal act is not always deemed to "break the causal chain"; a hotel is liable for its negligence that allows a criminal who is not employed by or otherwise affiliated with the hotel to commit a crime against a guest. E.g., *Shadday v. Omni Hotels Management Corp.*, 477 F.3d 511, 512-13 (7th Cir. 2007); *Wassell v. Adams*, 865 F.2d 849 (7th Cir. 1989). The difference between the two examples has nothing to do with causation. In both the loss is attributable to multiple factors (including, in the oil-spill case, the presence of oxygen in the atmosphere). Without all of them the loss would not have occurred. But the hotel is held responsible because its

guests expect it to take reasonable measures to protect them, while the truck company is excused from responsibility because the probability of a mischief maker's chancing on a pool of oil and dropping a lighted match into it is so slight that imposing liability would not cause the company to take additional measures to avoid spills. *Jutzi-Johnson v. United States*, 263 F.3d 753, 755-56 (7th Cir. 2001). So liability would not enhance safety.

This is a multiple-factor case too, as shown by the presence of a mirror-image buyer's indemnification clause in the contract for the sale of Eaton-Kenway to HK. Not only was Eaton obligated to indemnify HK for certain losses (the obligation that is the basis of the present suit), but HK was required to indemnify Eaton for losses resulting from "any act or omission of the Buyer [HK] or any occurrence of a matter with respect to the Subject Assets or the Subject Business relating to or arising out of the period after the Closing Date" of the sale. The loss of which HK is complaining would not have occurred had it not signed the contract with IBP, an "act" or "occurrence" that took place after the sale of the business. But this implies that if HK is entitled to indemnification from Eaton for the loss arising from the settlement of IBP's suit, Eaton is entitled to be indemnified by HK for Eaton's loss—the loss consisting of the judgment entered on the jury verdict in this case.

To break out of this ridiculous circle, the judge construed the indemnification clauses narrowly. In particular, he ruled that Eaton was required to indemnify HK only if Eaton's "act or omission . . . directly

[gave] rise to a claim against HK." This condition had not been satisfied, the judge thought, because HK should not have signed the contract with IBP without first making sure that its new acquisition, Eaton-Kenway, would be able to fulfill the duties that the contract placed on its new parent. Had the sale not taken place—had Eaton rather than HK contracted with IBP—Eaton might have insisted on terms that would have protected itself from liability if it could not perform up to IBP's expectation. It had no opportunity to do this. That became HK's opportunity, and it muffed it.

The judge's allocation of responsibility was in accordance with the principle, which we expounded in a recent case also governed by Wisconsin law, though the case involved a contract of formal insurance rather than an indemnification clause in an ordinary commercial contract, that without express language an indemnitor will not be found to have agreed to indemnify an indemnitee against the consequences of the breach of a contract that the latter signs *after* the indemnity contract or the formal insurance contract goes into effect. We explained that "insurance policies are presumed not to insure against liability for breach of contract. The reason is the severe 'moral hazard' problem to which such insurance would often give rise. The term refers to the incentive that insurance can create to commit the act insured against, since the cost is shifted to the insurance company . . . . [S]uppose, having somehow persuaded an insurance company to insure against liability for breach of contract, you hire a contractor to build an extension on your house and after he has completed his work you

refuse to pay him, and, when he sues, you turn his claim over to the insurance company." *Krueger Int'l, Inc. v. Royal Indemnity Co.*, 481 F.3d 993, 996 (7th Cir. 2007); see also *Farmers Automobile Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7th Cir. 2007).

This case is the same; HK signed the contract with IBP after Eaton had promised to indemnify HK. And the Wisconsin courts have extended from formal insurance contracts to indemnification clauses the principle that indemnification is presumed not to extend to the consequences of activity that is in the control of the party seeking indemnification. *Dykstra v. Arthur G. McKee & Co.*, 301 N.W.2d 201, 204 (Wis. 1981); *Hortman v. Otis Erecting Co.*, 322 N.W.2d 482, 486 (Wis. App. 1982); *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 524 (7th Cir. 2008) (Wisconsin law). Thinking that it would be indemnified for any losses on its contract with IBP, HK had a diminished incentive to try to minimize its potential liability for such losses in negotiating the terms of the contract.

HK actually *wants* us to treat Eaton just like an insurance company. It complains that when it (in effect) tendered the defense of IBP's suit to Eaton by notifying Eaton of the suit and offering it an opportunity to participate, Eaton refused the tender. But that could matter only if Eaton were contending that HK should not have settled IBP's suit for the amount it did, or otherwise complaining about not having controlled the litigation. Instead it is contending that the indemnification clause was inapplicable to losses based on a suit that arose from a contract made after the clause took effect. Even

insurance companies as we said don't insure against breaches of contract, because if they did people would break their contracts with impunity. HK's claim is even weaker because it wants us to rule that Eaton insured it against liability for breach of a contract that hadn't been made yet. For all we know, had Eaton-Kenway not been sold to HK the contract between Eaton-Kenway/Alvey and IBP would have looked completely different from the contract that HK negotiated.

HK argues that "no prudent business relies on an indemnity to avoid meeting its business commitments." True; but armed with an indemnity, a business will take risks that it would not take had it to bear the entire cost of its mistakes. HK could promise IBP more than it was certain that it could deliver because the indemnity cushioned it (it thought) against the full consequences of being unable to honor its promise. HK unguardedly acknowledged as much in its opening brief in this court when it said that "the broad indemnity by Eaton was a substitute for the assessment of risks" by HK.

Remember that the letter of intent that IBP sent Eaton before the sale of Eaton-Kenway was only two sentences long; the only term in it was the price term. HK does not claim that it was an enforceable contract; it was not. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) (Wisconsin law). HK itself is emphatic that the enforceability of the letter of intent is "irrelevant." In the unlikely event that it were deemed enforceable, it would be enforceable only as a contract to continue negotiating, e.g., *Venture Associates Corp. v. Zenith Data Systems Corp.*,

96 F.3d 275, 276-80 (7th Cir. 1996), because it did not specify Eaton's performance.

We can imagine a jury's being told to allocate responsibility for the loss to HK between Eaton—for its alleged misrepresentations to IBP regarding the speed of the material-handling system—and HK for failing either to verify the capabilities of its newly acquired division or to negotiate a contract that would minimize its liability in the event that the system did not meet IBP's high expectations. Any such division of fault would be likely to be arbitrary, especially given the mirror-image indemnification clause that would entitle Eaton to complain that HK's signing of the contract that gave rise to the suit and settlement triggered that clause, creating an endless cross-indemnity loop. HK had the last clear chance to avoid or limit liability, and it should not be allowed to shift that liability to its predecessor. In any event, HK did not ask the jury to make such an allocation. It wagered double or nothing. It gets nothing.

This is not to say that HK would have no possible remedy against misrepresentations by Eaton. Suppose Eaton had grossly exaggerated the value of Eaton-Kenway to HK, and HK had all unknowingly obtained loans that it could not repay because it had depleted its assets in buying what turned out to be a worthless company. In a suit by lenders against HK, HK would be entitled to indemnity from Eaton both under the buyer's indemnification clause and as a matter of general tort principles of indemnity because Eaton would have been the active tortfeasor. *Jones v. General Casualty Co.*, 582 N.W.2d 110,

112 (Wis. App. 1998); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First National Bank*, 774 F.2d 909, 916-19 (8th Cir. 1985); *White v. Johns-Manville Corp.*, 662 F.2d 243, 249-50 (4th Cir. 1981). If, moreover, Eaton was guilty of misrepresentations (or misleading omissions) so well concealed that no amount of care by HK in negotiating with IBP could have detected them, and no duty of prudence required HK to insist on terms in its contract with IBP that would have prevented IBP from suing for breach of contract, HK could have sued Eaton for fraud, and issues of indemnification would have fallen by the wayside. What HK could not do was treat Eaton's contractual duty of indemnification as insuring HK against the consequences of signing a contract that exposed it to a suit for breach of that contract.

AFFIRMED.